908 So.2d 615 (2005)
William Daniel JONES, Appellant,
v.
STATE of Florida, Appellee.
No. 4D03-4881.
District Court of Appeal of Florida, Fourth District.
August 24, 2005.
Rehearing Denied August 24, 2005.
*616 Carey Haughwout, Public Defender, and Louis G. Carres, Assistant Public Defender, West Palm Beach, for appellant.
*617 Charles J. Crist, Jr., Attorney General, Tallahassee, and Monique E. L'Italien, Assistant Attorney General, West Palm Beach, for appellee.

ON MOTION FOR CLARIFICATION
PER CURIAM.
We grant appellant's motion for clarification, withdraw our slip opinion of June 8, 2005, and substitute the following. Appellant's and appellee's motions for rehearing are denied.
This appeal arises from a conviction for solicitation to commit second degree murder, following a jury trial, and a sentence to fifteen years in prison. Because the crime for which William Daniel Jones ("Jones") was convicted is inapplicable to the facts in this case, we reverse his conviction and remand the case to the trial court to enter a conviction for solicitation to commit aggravated battery. Any other issues appealed are affirmed or rendered moot by this opinion.
Jones was charged by information with solicitation to commit first degree murder upon David Hunt ("Hunt"). The information alleged that Jones "did command, encourage, hire, or request David Ruiz and/or Deputy Gary Morales to engage in specific conduct which would constitute First Degree Murder, or an attempt to commit First Degree Murder in violation of Florida Statute 782.04(1) & 777.04."
In July of 2002, Hunt was the boyfriend of Delena Jones ("Delena"). Delena was married to Jones. Hunt and Delena were in a relationship for about a year and a half and were living together in July of 2002. In March of 2002, Hunt had been a witness in a case against Jones where Hunt claimed to be a victim and Jones was the accused.
Detective Dan Burkhardt was assigned to gather information from St. Lucie County Jail inmates. Burkhardt came in contact with inmate David Ruiz in July of 2002 when Ruiz told him someone might be hurt or killed on the outside. Ruiz gave Burkhardt a letter Jones had written to Ruiz that contained relevant addresses and routes. Ruiz and Burkhardt recorded a phone call in which Ruiz called Jones at his home.
Ruiz testified at Jones' trial that he and Jones were friends and they were incarcerated together during 2002. Jones told Ruiz to "pay somebody a visit," which meant to "make sure he didn't show up back to the courtroom.... Or make sure he couldn't testify against him." Ruiz testified that he assumed that Jones meant he wanted Ruiz to kill Hunt. However, Ruiz later stated on cross-examination that Jones did not actually use the word "kill."
In a recorded call, Ruiz told Jones that he had contacted "Frankie," who would call Jones to arrange to meet him. Detective Morales, posing as "Frankie," met Jones. When Jones got into the car with Morales, Jones said he was nervous because of a patrol car across the street. They drove around and Jones told him to pull into a Wal-Mart parking lot. They exited the vehicle and started talking. Jones acted nervous  he walked up and down the side of the vehicle, looked inside the backseat and trunk space, ran his hands through his hair, and started sweating heavily. They drove to Hunt's apartment and back to the original meeting place. During the drive they discussed what Jones wanted Morales to do. When they returned to the meeting place, Jones was taken into custody.
Detective Robert Harold Graff conducted surveillance and safety for Morales' meeting with Jones. Graff and numerous other cars followed them. Morales wore a hidden transmitter. Due to equipment *618 failure, only some of the conversation between Morales and Jones was recorded. Graff was still able to listen in on the conversation.
After the recorder stopped working, Graff heard Jones giving directions to Morales to show him Hunt's daily route. He told Morales that the best place to do this was probably at work to make it look like a robbery. He also said that he preferred Morales not do it at the apartment where Hunt's girlfriend was staying. He described vehicles to Morales. According to Graff, "Detective Morales asked Jones exactly what he wanted and he said, kill him. Morales said, what? He said, kill him. And there was a pause and, uh, [Jones] says, do whatever you do."
Lieutenant Steven Sigmon also participated in the surveillance of Jones and Morales. He heard Jones explaining to Morales different ways to arrive at the apartment that did not require one to drive directly from U.S. 1. Jones stated where Hunt worked and that he wanted to make sure that the girlfriend was not there. Sigmon testified that Jones told Morales "that he wanted the subject that they were talking about gone, wanted him taken out of the picture, wanted him gone, want him dead. And right after he said he wanted him dead, he paused for a second and then he said, I want him gone."
Sigmon testified that Morales told Jones that he would need a piece to do it with and Jones replied that he could get Morales a gun later but not right then. Morales asked what Jones wanted done and Jones quickly answered, just kill him. Jones said that he wanted Hunt beaten so bad he wanted him in a wheelchair. Jones said that he wanted Hunt beaten uncontrollably  "I want him beat so bad he die, I want him gone." Jones also said that if that doesn't work then Morales would have to come back later and take care of him.
The state played a tape of the recorded portion of the conversation between Jones and Morales for the jury. Portions of the dialogue could be interpreted as Jones stating that he wanted Hunt killed. Other portions could be interpreted as Jones stating that he wanted Hunt beaten up so badly that he would need a wheelchair, but not necessarily killed.
Morales testified that after the tape ended because of the batteries dying, Jones told him he should make it look like someone tried to rob him and he was killed. Morales followed up and asked Jones how he wanted Hunt dead and Jones said, "I just want the mother f  gone. I just want the mother  I just want him dead, man."
On cross-examination, Morales testified as follows:
DEFENSE: ... And you said that you believed and told [the prosecutor] and this jury that you took when he says I want to take him out to mean I want to kill him, is that correct?
MORALES: That's what I believe, yes.
DEFENSE: Okay. But did you hear him on the tape make this exact statement? I want him gone and then if that don't work, then we'll come back and do something else?
MORALES: Yes.
DEFENSE: So apparently when he says I want him gone, that didn't mean kill him because if you killed him you wouldn't have to come back and do anything else, would you? It would be the end of it, wouldn't it.
MORALES: If I didn't do it right.
DEFENSE: So if he says I want it done and if that don't work, then we'll come back and do it  we'll kill him. Did he say to you also, I just want him in a wheelchair?
MORALES: He also said that, yes.

*619 DEFENSE: Yeah. And then if that don't get him out of the picture, away from my wife or whatever, then we'll come back later and do it, isn't that correct?
MORALES: Yes.
Jones also testified at trial on his own behalf, admitting to wanting to have Hunt beaten up but denying that he wanted Hunt to be killed. He insisted that he told Morales that he did not want Hunt killed.
In reviewing the proposed jury instructions, the state specifically requested an instruction on solicitation to commit second degree murder and defense counsel objected to giving such instruction, arguing that it would be confusing. The trial court overruled the objection. The jury returned a guilty verdict of solicitation to commit second degree murder. Jones moved for a new trial on the grounds that the verdict was inconsistent with the law and the facts. The trial court adhered to its ruling during trial that the jury could legally return the verdict that it returned and denied the motion for new trial. The court adjudicated Jones guilty of solicitation to commit second degree murder and imposed a sentence of fifteen years in prison.
Jones' primary argument on appeal is that the crime of solicitation to commit second degree murder does not exist in the state of Florida. A question of law is reviewed de novo. Nelson v. State, 875 So.2d 579, 581 (Fla.2004). Jones was convicted of solicitation to commit second degree murder. The Florida Supreme Court defines the elements of criminal solicitation as follows:
(1) commanding, hiring, requesting, or encouraging another person to commit a crime and (2) the intent that the other person commit the crime. No agreement is needed, and the fact that the person solicited has no intention of committing the crime is irrelevant as long as the command, request, or encouragement is made with the requisite intent.
The Florida Bar v. Marable, 645 So.2d 438 (Fla.1994). Solicitation to commit murder "indisputably ... requires guilty knowledge or mens rea." Mascola v. Lusskin, 727 So.2d 328, 332 (Fla. 4th DCA 1999). Because present intent is a requirement for solicitation, a defendant cannot be convicted of solicitation where the uncontroverted evidence shows that the defendant would decide at a later date if he or she wishes the "hit man" to proceed. State v. Gaines, 431 So.2d 736, 737-38 (Fla. 4th DCA 1983).
Second degree murder is defined as follows: "The unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual." § 782.04(2), Fla. Stat. The phrase "imminently dangerous to another and evincing a depraved mind regardless of human life" has been described by this court to mean an act or series of acts that:
1. a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another, and
2. is done from ill will, hatred, spite or an evil intent, and
3. is of such a nature that the act itself indicates an indifference to human life.
Sigler v. State, 805 So.2d 32, 34 (Fla. 4th DCA 2001), rev. denied, 823 So.2d 126 (Fla.2002).
As the Florida Supreme Court held in Achin v. State, 436 So.2d 30, 31 (Fla.1982), "no one may be convicted of a nonexistent crime. Our decisions are clear on this issue." A defendant cannot be convicted of a nonexistent lesser included offense, *620 even if defense counsel would have specifically requested that the court give a jury instruction for the nonexistent offense. Id.; Hieke v. State, 605 So.2d 983 (Fla. 4th DCA 1992) (holding that there is no such crime as solicitation to commit third degree murder).
We are aware of Miller v. State, 430 So.2d 611 (Fla. 4th DCA 1983), upon which Hieke relied, in which we held "[w]e cannot envision a situation in which a jury could find a contract killing as anything other than premeditated." Although we stated that we "cannot envision" a contract killing that was not first degree murder, we did not go so far as to hold that solicitation to commit second degree murder does not exist. However, we do not need to hypothesize here as to potential factual scenarios in which the crime of solicitation to commit second degree murder might exist because we hold that, under the facts in this case, the only available options for the jury were solicitation to commit first degree murder or solicitation to commit aggravated battery. In the present case, even if the jury returned the guilty verdict for solicitation to commit second degree murder as a form of jury pardon on the charge of solicitation to commit first degree murder, we cannot affirm the conviction because Jones specifically objected at trial to giving the instruction on solicitation to commit second degree murder.
We note that we have not found Florida cases which expressly state the crime of solicitation to commit second degree murder does or does not exist, but we have found case law from Florida and other jurisdictions that would support the existence of such a crime in Florida.[1]See Edwards v. State, 705 So.2d 943, 945 (Fla. 5th DCA 1998) (stating defendant "was on conditional release for solicitation of second degree murder"); People v. Laurson, 70 P.3d 564 (Colo.App.2002) (affirming thirty-year sentence for "criminal solicitation to commit second degree murder"); State v. Canion, 199 Ariz. 227, 16 P.3d 788 (App. 2000) (affirming conviction for solicitation to commit second degree murder); Matter of Mahrle, 88 Wash.App. 410, 945 P.2d 1142 (1997) (holding that solicitation to commit second degree murder is a class B felony); People v. Bongarzone, 116 A.D.2d 164, 167, 500 N.Y.S.2d 532 (1986) (upholding solicitation conviction for second degree murder).
Accordingly, we reverse the conviction and remand this case to the trial court with directions to enter judgment for the lesser included offense of guilty of solicitation to commit aggravated battery. See § 924.34, Fla. Stat. ("When the appellate court determines that the evidence does not prove the offense for which the defendant was found guilty but does establish guilt of . . . a lesser offense necessarily included in the offense charged, the appellate court shall reverse the judgment and direct the trial court to enter judgment for the lesser degree of the offense or for the lesser included offense.").
As to the evidentiary issue raised on appeal, we hold that the trial court did not abuse its discretion in overruling Jones' objection and allowing Ruiz to testify as to his opinion regarding statements made by Jones. "Admission of evidence is within the discretion of the trial court and will not be reversed unless there has been *621 a clear abuse of that discretion." Ray v. State, 755 So.2d 604, 610 (Fla.2000).
At trial, the prosecutor asked Ruiz what Jones wanted him to do to Hunt. The following exchange then took place:
RUIZ: Make sure he never made it to the courtroom.
STATE: And what does that mean to you?
RUIZ: There's only one definition you can have for that, sir.
STATE: Okay. And that's 
Defense counsel objected that the question calls for speculation and conclusion. The trial court overruled the objection and stated that he believed it was a proper response to the question. The following exchange then took place:
STATE: Did you have ongoing discussions with William Daniel Jones 
RUIZ: Yes sir.
STATE: D.J.? And when you say make him not come to court, spell it out for the members of the jury, what do you mean?
RUIZ: I don't know, I would say just make sure he never showed up. I mean if I put it like that 
STATE: All right.
RUIZ: Take him out.
STATE: Okay. And does that mean to beat him up, does that mean kill him, what does that mean?
RUIZ: I would assume kill, sir.
Jones argues that the trial court abused its discretion in admitting Ruiz's testimony because it is irrelevant to any material issue in the case and calls for speculation by the witness. To be preserved for further review by a higher court, an issue must be presented to the lower court and the specific legal argument or ground to be argued on appeal or review must be part of that presentation. Lacey v. State, 831 So.2d 1267, 1268 (Fla. 4th DCA 2002). At trial, defense counsel objected to Ruiz's testimony because it "calls for speculation and conclusion. That's the jury's decision to decide what is meant by that." Thus, the issue is preserved with respect to speculation, but the issue is not preserved with respect to relevance because Jones did not raise that specific argument below.[2]
Testimony based on speculation should be excluded as inadmissible. Sec. Mgmt. Corp. v. Markham, 516 So.2d 959, 963 (Fla. 4th DCA 1987).
Conjecture has no place in proceedings of this sort.... The law seems well established that testimony consisting of guesses, conjecture or speculation  suppositions without a premise of fact  are clearly inadmissible in the trial of causes in the courts of this country. A statement by a witness as to what action he would have taken if something had occurred which did not occur ... or what course of action a person would have pursued under certain circumstances which the witness says did not exist will *622 ordinarily be rejected as inadmissible and as proving nothing.
LeMaster v. Glock, Inc., 610 So.2d 1336, 1338-39 (Fla. 1st DCA 1992) (quoting Drackett Prods. Co. v. Blue, 152 So.2d 463, 465 (Fla.1963)). Here, Ruiz's testimony did not constitute "speculation  suppositions without a premise of fact." To the contrary, there was clearly evidence of a basis for Ruiz to know Jones' subjective meaning of the phrase he spoke to Ruiz. Ruiz testified to a prior history of close friendship and ongoing discussions between Ruiz and Jones. Ruiz also testified that he and Jones had multiple discussions regarding what Ruiz was going to do to Hunt. Under these circumstances, Ruiz's testimony as to his interpretation regarding statements made to him by Jones was not inadmissible speculation.[3] Therefore, we affirm the trial court's evidentiary ruling admitting Ruiz's testimony.
Lastly, Jones argues that the trial court erred in scoring his offense. Because we are reversing the conviction for solicitation to commit second degree murder and remanding this case for the trial court to enter a conviction for solicitation to commit aggravated battery, this issue is moot.
Affirmed in Part, Reversed in Part.
GUNTHER, POLEN and HAZOURI, JJ., concur.
NOTES
[1] We also note that the similar inchoate crimes of conspiracy to commit second degree murder and attempt to commit second degree murder are crimes under Florida law. Willis v. State, 700 So.2d 1232 (Fla. 4th DCA 1997) (conspiracy); Connelly v. State, 704 So.2d 590 (Fla. 4th DCA 1997) (conspiracy); Powlowski v. State, 467 So.2d 334 (Fla. 5th DCA 1985) (conspiracy); Brown v. State, 790 So.2d 389 (Fla.2000) (attempt).
[2] Even if the issue of relevancy had been preserved by an objection in the trial court, it was not an abuse of discretion for the trial court to admit Ruiz's testimony as relevant. "A trial court has broad discretion in determining the relevance of evidence and such a determination will not be disturbed absent an abuse of discretion." Sexton v. State, 697 So.2d 833, 837 (Fla.1997). In order for evidence to be admissible, it must first be legally relevant; such evidence must have the tendency to prove or disprove a material fact in issue. See §§ 90.401, 90.402, Fla. Stat. (2002). The evidence showed that Jones solicited Ruiz to harm Hunt. Clearly, Ruiz's interpretation of Jones' statement to him was material. If Jones solicited Ruiz to commit murder, Ruiz was the only person other than Jones to know what Jones intended Ruiz to do.
[3] Additionally, Ruiz's testimony constituted admissible lay witness testimony. See Vasquez v. State, 763 So.2d 1161 (Fla. 4th DCA 2000).